FILED

SEP 23 2019

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

**ARREST ON OUT-OF-DISTRICT OFFENSE**

CASE NUMBER: 19MJ4109

The person charged as **Lawrence Isen** now appears before this United States District Court for an initial appearance as a result of the following charges having been filed in the **United States District Court for the Eastern District of New York**: **Conspiracy to Commit Securities Fraud** in violation of Title 18 United States Code, Sections 371 and 3551; **Conspiracy to Commit Wire Fraud** in violation of Title 18, United States Code, Sections 1349 and 3551; **Securities Fraud** in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 18, United States Code, Sections 2 and 3551; and **Conspiracy to Commit Money Laundering** in violation of Title 18, United States Code, Sections 1956(h), 1957(b), 1957(d)(1) and 3551.

The charging documents and warrant for the arrest of the defendant which was issued by the above United States District Court are attached hereto.

I hereby swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED: 9/23/2019 _____ (signature)

Laura Wetterer (print)
Special Agent,
Federal Bureau of Investigation

Reviewed and Approved
Dated: 9/23/19

Assistant United States Attorney

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of New York

| United States of America | ) | **CR 19 432** |
|---|---|---|
| v. | ) | Case No. |
| LAWRENCE ISEN | ) | |
| | ) | SEYBERT, J. |
| | ) | |
| Defendant | ) | TOMLINSON, M.J. |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*   LAWRENCE ISEN                                                                                   ,
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment     ☐ Superseding Indictment     ☐ Information     ☐ Superseding Information     ☐ Complaint
☐ Probation Violation Petition     ☐ Supervised Release Violation Petition     ☐ Violation Notice     ☐ Order of the Court

This offense is briefly described as follows:

Conspiracy to commit securities fraud, conspiracy to commit wire fraud, securities fraud and conspiracy to commit money laundering.

Date:   09/20/2019

*Issuing officer's signature*

City and state:   Brooklyn, New York

Steven M. Gold, U.S.M.J.
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____ at *(city and state)* _____. |
| Date: _____ |
| *Arresting officer's signature* |
| *Printed name and title* |

AO 442 (Rev. 11/11) Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender: _____

Known aliases: _____

Last known residence: _____

Prior addresses to which defendant/offender may still have ties: _____

Last known employment: _____

Last known telephone numbers: _____

Place of birth: _____

Date of birth: _____

Social Security number: _____

Height: _____  Weight: _____

Sex: _____  Race: _____

Hair: _____  Eyes: _____

Scars, tattoos, other distinguishing marks: _____

History of violence, weapons, drug use: _____

Known family, friends, and other associates *(name, relation, address, phone number)*: _____

FBI number: _____

Complete description of auto: _____

Investigative agency and address: _____

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*: _____

Date of last contact with pretrial services or probation officer *(if applicable)*: _____

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ SEP 2 0 2019 ★

BROOKLYN OFFICE

ALB:EEA
F. #2018R02094

**SEYBERT, J.**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------X

**TOMLINSON, M.J.**

UNITED STATES OF AMERICA

- against -

BENJAMIN CONDE and
LAWRENCE ISEN,

Defendants.

INDICTMENT

CR No. __19__ __432__
(T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18,
U.S.C., §§ 371, 981(a)(1)(C), 982(a)(1),
982(b)(1), 1349, 1956(h), 1957(b),
1957(d)(1), 2 and 3551 et seq.; T. 21,
U.S.C., § 853(p); T. 28, U.S.C.,
§ 2461(c))

----------------------------X

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.   The Relevant Entities, Co-Conspirators and Defendants

1.   My Street Research was a purported financial services business headquartered in Melville, New York, which promoted the stocks of publicly traded companies to individual investors, primarily through cold-call campaigns and the circulation of a newsletter. My Street Research was founded under the name Dacona Financial and, thereafter, changed its name to Power Traders Press ("PTP"), then to Trade Masters Pro and, most recently, to My Street Research. Dacona Financial, PTP, Trade Masters Pro and My Street Research (collectively, the "Boiler Room") all operated from the same office in Melville, New York, and kept substantially the same management despite the changes in the Boiler Room's name. The Boiler Room had various bank and brokerage accounts in its name, including, inter alia, brokerage accounts in the name of PTP. The Boiler Room maintained an Internet presence with

more than one website from approximately 2014 through 2017. One or more of these websites marketed the Boiler Room as an "unbiased stock research firm" that provided "top notch, detailed, unbiased research."

2. Renewable Energy and Power, Inc. ("RBNW") was a publicly traded company with its principal place of business in Las Vegas, Nevada. RBNW planned to provide renewable energy competitive with fossil fuels.

3. Essex Global Investment Corporation, Inc. ("Essex") was a purported financial investment company incorporated in Nevada in 2013 by the defendant BENJAMIN CONDE. CONDE was the Chief Executive Officer ("CEO") of Essex. CONDE opened a brokerage account in Essex's name (the "Essex Brokerage Account") with Broker Dealer A, the identity of which is known to the Grand Jury, in approximately August 2015. Associates 1 and 2, individuals whose identities are known to the Grand Jury, worked at Essex.

4. Facultas Capital Management, LLC ("Facultas") was a purported financial investment company incorporated in New Jersey in 2015 by the defendant BENJAMIN CONDE. CONDE was the President of Facultas. CONDE opened a brokerage account in Facultas's name (the "Facultas Brokerage Account") with Broker Dealer B, the identity of which is known to the Grand Jury, in approximately December 2014.

5. Marketbyte LLC ("Marketbyte") was a purported investor relations and marketing firm with its principal place of business in San Diego, California. The defendant LAWRENCE ISEN controlled Marketbyte. Marketbyte facilitated the distribution of proceeds

between the defendant BENJAMIN CONDE and the Boiler Room. ISEN was also a signatory on a bank account at Wells Fargo Bank, N.A. in Marketbyte's name (the "Marketbyte Bank Account").

6. The defendant BENJAMIN CONDE was the signatory on a bank account at Valley National Bank, N.A. in Essex's name (the "Essex Bank Account"), and he controlled the Essex Brokerage Account and the Facultas Brokerage Account.

7. The defendant LAWRENCE ISEN was a professional marketer. ISEN was also formerly a registered broker-dealer, who had been barred from working in the broker-dealer industry in or about 1995.

8. Co-Conspirator 1, an individual whose identity is known to the Grand Jury, was an account executive at the Boiler Room and promoted and sold various stocks through cold-call campaigns and newsletters.

II. Relevant Regulatory Principles and Definitions

9. A "security" was, among other things, any note, stock, bond, debenture, evidence of indebtedness, investment contract or participation in any profit-sharing agreement.

10. "Microcap" or "penny" stocks referred to stocks of publicly traded U.S. companies that had a low market capitalization. Microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that traded on notable exchanges. Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

11. A "pump and dump" scheme was a scheme in which a group of individuals who controlled the free trading of allegedly unrestricted shares, also referred to as the "float," of a microcap company fraudulently inflated the share price and trading volume of the

3

targeted microcap company through, <u>inter alia</u>, wash and matched trades, press releases and paid stock promotions. When the targeted microcap company's share price reached desirable levels, the individuals sold their free trading shares for substantial financial gain.

12. "Wash trades" were purchases and sales of securities that matched each other in price, volume and time of execution, and involved no change in beneficial ownership. For example, a wash trade took place when Investor A bought 100 shares at $5.00 per share of Company A through Broker 1, while simultaneously selling 100 shares at $5.00 per share of Company A through Broker 2. "Matched trades" were similar to wash trades, but involved a related third person or party who placed one side of the trade. For example, a matched trade took place when Investor A bought 100 shares at $5.00 per share of Company A through a broker, while Investor B, who coordinated with Investor A, simultaneously sold 100 shares at $5.00 per share of Company A through a broker. Both wash trades and matched trades were used to create the appearance that the stock price and volume rose as a result of genuine market demand for the securities.

13. "Scalping" referred to a practice in which an individual recommended that an investor purchase a security so as to increase the share price and trading volume of the security, without adequately disclosing ownership and intent to sell the same security, and then proceeded to sell the security following the recommendation.

III. The Pump and Dump Scheme

14. In or about and between March 2017 and July 2017, both dates being approximate and inclusive, the defendants BENJAMIN CONDE and LAWRENCE ISEN, together with others, hired the Boiler Room to engage in a "pump and dump" scheme to defraud investors and potential investors in RBNW by artificially generating increased trading volume in

4

RBNW shares and an increased RBNW share price, including by convincing victim investors to purchase thousands of RBNW shares at inflated prices.

15. In order to carry out the pump and dump scheme, in or about and between March 2017 and July 2017, the defendant BENJAMIN CONDE, through Essex, obtained approximately 9.5 million shares of RBNW through a convertible redeemable note with RBNW and deposited the shares into the Essex Brokerage Account.

16. In approximately March 2017, the defendant LAWRENCE ISEN introduced the defendant BENJAMIN CONDE to Co-Conspirator 1 at the Boiler Room for the purpose of arranging to artificially inflate the trading volume and share price of RBNW's stock. In exchange for this introduction, CONDE agreed to pay ISEN approximately 13 percent of earnings generated by the Boiler Room's fraudulent promotion of RBNW stock. Thereafter, CONDE hired the Boiler Room to fraudulently promote RBNW stock.

17. In or about and between March 2017 and July 2017, the defendant BENJAMIN CONDE, together with others, including Associates 1 and 2, used the Essex Brokerage Account and the Facultas Brokerage Account to engage in manipulative trading patterns, including wash trades and matched trades, to drive up the price of the RBNW shares, while Co-Conspirator 1 and the Boiler Room aggressively and repeatedly called and emailed victim investors, many of whom were senior citizens – including Victims A, B and C, individuals whose identities are known to the Grand Jury – to purchase shares in RBNW. When victim investors indicated a willingness to purchase a recommended stock, the Boiler Room called the victim investors repeatedly, pressured them to follow through with their purchases and directed them to log into their brokerage accounts while still on the telephone to place purchase

orders for RBNW stock. In some cases, the Boiler Room also charged the victim investors for "subscriptions" to receive stock recommendations.

18. In or about and between March 2017 and July 2017, in order to carry out the fraudulent stock manipulation scheme described above, the Boiler Room conducted a campaign to convince victim investors to purchase shares of RBNW on the open market. Simultaneously with these purchases, the defendant BENJAMIN CONDE, together with Associates 1 and 2, sold Essex's shares of RBNW on the open market.

19. Co-Conspirator 1 and the Boiler Room did not disclose to the victim investors that, contemporaneously with or shortly after the recommendations were made to the victim investors to purchase shares of RBNW, the defendant BENJAMIN CONDE planned to sell his own shares of RBNW stock. The victim investors were, therefore, left with the false and misleading impression that the stock of RBNW was a sound investment in which Co-Conspirator 1 and the Boiler Room themselves firmly believed. Ultimately, the defendant BENJAMIN CONDE, the defendant LAWRENCE ISEN, Co-Conspirator 1 and the Boiler Room profited from the manipulative trading in RBNW shares when CONDE sold substantial amounts of the shares at the inflated prices that the fraudulent scheme had generated.

20. In or about and between March 2017 and July 2017, the scheme to fraudulently manipulate RBNW stock by the defendants BENJAMIN CONDE, LAWRENCE ISEN, Associates 1 and 2, Co-Conspirator 1, the Boiler Room and others, generated over $3.1 million in trading profits.

V. The Scheme to Launder the Proceeds of the Pump and Dump Scheme

21. In or about and between April 2017 and July 2017, the defendants BENJAMIN CONDE and LAWRENCE ISEN, together with others, engaged in a scheme to

launder over $2.85 million in proceeds of the fraudulent scheme, which trading profits were deposited primarily into the Essex Brokerage Account.

22. In or about and between April 2017 and July 2017, the defendant BENJAMIN CONDE sent out via wire transfers the trading profits from the Essex Brokerage Account to the Essex Bank Account. CONDE then sent a substantial portion of the trading profits via wire transfer from the Essex Bank Account to the Marketbyte Bank Account, which was controlled by the defendant LAWRENCE ISEN. ISEN thereafter transferred portions of those funds from the Marketbyte Bank Account to bank accounts affiliated with the Boiler Room, while keeping the remainder of the funds in the Marketbyte Bank Account. Co-Conspirator 1 emailed invoices to ISEN describing purported services performed by the Boiler Room for Marketbyte, to lend the appearance of legitimacy to the wire transfers. ISEN further transferred portions of the remaining funds in the Marketbyte Bank Account to one or more bank accounts in ISEN's name, which funds ISEN used to pay for his personal expenses.

23. As a result of the money laundering scheme, approximately $1.7 million of the RBNW trading profits were transferred to the Marketbyte Bank Account. The defendant LAWRENCE ISEN retained approximately $236,000 of the funds as compensation for his role in introducing the defendant BENJAMIN CONDE to Co-Conspirator 1 and the Boiler Room.

### COUNT ONE
(Conspiracy to Commit Securities Fraud)

24. The allegations contained in paragraphs one through 23 are realleged and incorporated as though fully set forth in this paragraph.

25. In or about and between March 2017 and July 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants BENJAMIN CONDE and LAWRENCE ISEN, together with others, did knowingly and willfully conspire to use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (i) employing one or more devices, schemes and artifices to defraud; (ii) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in RBNW, in connection with the purchase and sale of investments in RBNW, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections '78j(b) and 78ff.

26. In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants BENJAMIN CONDE and LAWRENCE ISEN, together with others, did commit and cause to be committed, among others, the following:

### OVERT ACTS

(a) On or about March 13, 2017, CONDE emailed ISEN, together with others, stating that the solar/renewable energy market was "Red Hot." On the same day, ISEN then forwarded CONDE's email to Co-Conspirator 1, noting that the attached email was "ammo for your guys" to use in pushing the purchase of stock with victims.

8

(b) In or about and between March 27, 2017 and March 31, 2017, CONDE sold approximately 1.2 million shares of RBNW from the Essex Brokerage Account, generating trading profits of approximately $341,000.

(c) On or about April 4, 2017, CONDE wired approximately $200,000 from the Essex Brokerage Account to the Essex Bank Account. On the same day, CONDE wired approximately $203,400 from the Essex Bank Account to the Marketbyte Bank Account.

(d) On or about April 4, 2017, ISEN wired a total of approximately $177,600 from the Marketbyte Bank Account to bank accounts affiliated with the Boiler Room.

(e) On or about April 5, 2017, the Boiler Room contacted Victim A at approximately 10:06 a.m. At approximately 10:09 a.m., CONDE called Broker Dealer A. At approximately 10:11 a.m., Victim A's purchase order of 50,000 shares of RBNW for approximately $0.43 per share was executed at the same time that the Essex Brokerage Account sold 50,000 shares of RBNW for approximately $0.43 per share.

(f) On or about April 27, 2017, at approximately 12:33 p.m., CONDE called Broker Dealer A. At approximately 12:34 p.m., the Boiler Room called Victim B. At the same time, while on the phone with the Boiler Room, Victim B purchased 10,000 shares of RBNW for approximately $0.47 per share. Also at approximately 12:34 p.m., the Essex Brokerage Account sold 10,000 shares of RBNW for approximately $0.47 per share.

(g) On or about May 15, 2017, at approximately 2:06 p.m. and 2:08 p.m., the Boiler Room called Victim C. At approximately 2:08 p.m., CONDE called Broker Dealer A. At approximately 2:09 p.m., Victim C purchased 50,000 shares of RBNW for approximately $0.44 per share, and the Essex Brokerage Account sold 50,000 shares of RBNW for approximately $0.44 per share.

(h)     On or about June 27, 2017 at approximately 10:00 a.m., a recorded call between CONDE and Broker Dealer B occurred, during which CONDE requested that a representative of Broker Dealer B execute on his behalf the purchase of 12,500 RBNW shares out of the Facultas Brokerage Account for approximately $0.30 per share. That share purchase occurred at approximately 10:04 a.m.

(i)     On or about June 27, 2017, at approximately 9:56 a.m., a call occurred between CONDE and Broker Dealer A. On or about June 27, 2017, at approximately 10:04 a.m., the Essex Brokerage Account sold 12,500 shares of RBNW stock for approximately $0.30 per share.

(j)     On or about July 10, 2017, CONDE wired approximately $51,000 from the Essex Bank Account to the Marketbyte Bank Account.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT TWO
(Conspiracy to Commit Wire Fraud)

27.     The allegations contained in paragraphs one through 23 are realleged and incorporated as though fully set forth in this paragraph.

28.     In or about and between March 2017 and July 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants BENJAMIN CONDE and LAWRENCE ISEN, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud one or more investors and potential investors in RBNW, and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire

communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT THREE
(Securities Fraud)

29. The allegations contained in paragraphs one through 23 are realleged and incorporated as though fully set forth in this paragraph.

30. In or about and between March 2017 and July 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants BENJAMIN CONDE and LAWRENCE ISEN, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in RBNW, in connection with the purchase and sale of investments in RBNW, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT FOUR
(Conspiracy to Commit Money Laundering)

31. The allegations contained in paragraphs one through 23 are realleged and incorporated as though fully set forth in this paragraph.

32. In or about and between April 2017 and July 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants BENJAMIN CONDE and LAWRENCE ISEN, together with others, did knowingly and intentionally conspire to engage in monetary transactions, to wit: deposits, withdrawals and transfers of funds and monetary instruments, in and affecting interstate commerce, by, through and to one or more financial institutions, in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit: fraud in the sale of securities, contrary to Title 15, United States Code, Sections 78j(b) and 78ff, all contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h), 1957(b), 1957(d)(1) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS ONE THROUGH THREE

33. The United States hereby gives notice to the defendants BENJAMIN CONDE and LAWRENCE ISEN that, upon their conviction of any of the offenses charged in Counts One through Three, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c),

which require any person convicted of such offenses to forfeit any property, real or personal, constituting or derived from proceeds obtained directly or indirectly as a result of such offenses.

34. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

### CRIMINAL FORFEITURE ALLEGATION AS TO COUNT FOUR

35. The United States hereby gives notice to the defendants BENJAMIN CONDE and LAWRENCE ISEN that, upon their conviction of the offense charged in Count Four, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

13

36. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

  (a) cannot be located upon the exercise of due diligence;

  (b) has been transferred or sold to, or deposited with, a third party;

  (c) has been placed beyond the jurisdiction of the court;

  (d) has been substantially diminished in value; or

  (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

*Richard P. Donoghue*
RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F#: 2018R02094
FORM DBD-34
JUN. 85

No. _____

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

vs.

BENJAMIN CONDE AND LAWRENCE ISEN,

Defendants.

# INDICTMENT

(T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18, U.S.C., §§ 371, 981(a)(1)(C), 982(a)(1), 982(b)(1), 1349, 1956(h), 1957(b), 1957(d)(1), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____
                                                         *Foreperson*

Filed in open court this _____ day,

of _____ A.D. 20 _____

_____
                                                             *Clerk*

Bail, $ _____

_____

*Erin E. Argo, Assistant U.S. Attorney (631) 715-7846*